MICHAEL GUIDRY AND WANDA GUIDRY INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, JONATHON GUIDRY
v.
LIVINGSTON PARISH SHERIFF'S DEPARTMENT, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, LIVINGSTON PARISH SCHOOL BOARD, CHILDREN'S EDITION DAYCARE, GAYBE HORNER, INTERSTATE INSURANCE UNDERWRITER'S INC., JOE SASSO, ROBERT DICKS AND STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
2008 CA 1976
Court of Appeals of Louisiana, First Circuit.
August 18, 2009.
Not Designated for Publication
LEWIS O. UNGLESBY, Baton Rouge, Louisiana and JUSTIN A. DAY, Baton Rouge, Louisiana, Counsel for Plaintiffs/Appellees, Michael Guidry and Wanda Guidry, individually and on behalf of their minor child, Jonathon Guidry.
STEPHEN D. ENRIGHT, Jr., Metairie, Louisiana and JAMES L. PATE, MELISSA L. THERIOT, PHILIP H. BOUDREAUX, Jr., Lafayette, Louisiana Counsel for Defendants/Appellants, Livingston Parish Sheriff's Office, Joe Sasso, Robert Dicks, and St. Paul, Fire and Marine Insurance Company.
Before: PARRO, McCLENDON, and WELCH, JJ.
McCLENDON, J.
The defendants appeal the judgment of the trial court in favor of the plaintiffs awarding damages resulting from an automobile accident. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL HISTORY
On December 18, 2003, Michael Guidry was traveling northbound in his pickup truck on Highway 16 in Denham Springs, Louisiana. Highway 16 is a four-lane highway with a median between the northbound and southbound lanes. Gaybe Horner, an employee of Children's Edition Daycare, was traveling west in the daycare's van on Cecil Drive, a two-lane street. As she approached Highway 16 and attempted to make a left turn onto the southbound lane of Highway 16, an accident occurred between the two vehicles.
At the time of the accident, two Livingston Parish Sheriff deputies, Joseph J. Sasso and Robert L. Dicks, were directing traffic at the intersection, which was in a school zone. Deputy Dicks walked out to the northbound lanes of Highway 16 to stop traffic. Deputy Sasso had already stopped the southbound traffic on Highway 16 and signaled Ms. Horner to proceed across the northbound lanes of Highway 16 through the intersection; however, Deputy Dicks had not yet stopped traffic on Highway 16, resulting in the collision between Ms. Horner's van and Mr. Guidry's pickup truck. Neither Ms. Horner nor any of the children in the van were injured. Mr. Guidry did not immediately seek medical assistance and did not believe that he sustained any injuries in the accident until sometime later.
Subsequently, Michael Guidry and Wanda Guidry, individually and on behalf of their minor child, Jonathon Guidry, filed suit against the Livingston Parish Sheriff's Office (LPSO);[1] its insurer, St. Paul Fire and Marine Insurance Company (St. Paul); Deputy Sasso; Deputy Dicks; Livingston Parish School Board;[2] Ms. Horner; Children's Edition Daycare; the van's insurer, Republic Vanguard Insurance Company (Republic);[3] and Mr. Guidry's uninsured motorist insurer, State Farm Mutual Automobile Insurance Company, asserting that they suffered damages as a result of the accident. Specifically, Mr. Guidry contended he suffered injuries to his neck and back, for which he has received extensive medical treatment. Mrs. Guidry and Jonathon Guidry each asserted a loss of consortium claim as a result of Mr. Guidry's injuries.
A two-day bench trial was held on August 29-30, 2007. At the start of the second day of trial, the trial court was informed that a settlement had been reached with Ms. Horner, Children's Edition Daycare, and Republic.[4] At the conclusion of trial, the trial court rendered judgment in favor of the plaintiffs and against LPSO and St. Paul, assessing 100% of the fault against LPSO.[5] Damages were awarded as follows:

Future Medical Expenses $ 32,000.00
Past Medical Expenses $ 28,752.38
Past Loss Wages $ 152,999.00
Future Loss Wages $ 572,085.00
Pain and Suffering/Loss of
Enjoyment of Life  Past/Future $ 100,000.00
Disability $ 75,000.00
Loss of Consortium for
Wanda Guidry $ 55,000.00
Loss of Consortium for
Jonathon Guidry $ 10,000.00
 _____________
Total Judgment $1,025,836.38

Judgment was signed on October 2, 2007. LPSO and St. Paul's (the defendants) suspensively appealed, assigning as error the award of past and future lost earnings and the lack of any allocation of fault as to Ms. Horner.

DISCUSSION
The defendants initially assert that the trial court erred in awarding damages for the loss of past and future earnings, contending that Mr. Guidry was already disabled at the time of the December 18, 2003 accident and was scheduled for back surgery later that month. Specifically, the defendants allege that the trial court erred in holding that the neck injuries sustained in the accident were sufficient to prevent Mr. Guidry from returning to work in his previous capacity, rather than requiring the plaintiffs to prove that Mr. Guidry was capable of working absent the accident. In other words, Mr. Guidry's preexisting and ongoing back problems prevented him from returning to work, regardless of the accident with Ms. Horner. Thus, according to the defendants, the plaintiffs failed in their burden of proving that Mr. Guidry was capable of gainful employment but for the accident. Therefore, the defendants contend that the trial court applied the incorrect legal standard regarding lost wages, requiring a de novo review by this court.
To recover for actual wage loss, a plaintiff must prove positively that he would have been earning wages but for the accident in question. Boyette v. United Services Auto. Assn., 00-1918, p. 5 (La. 4/3/01), 783 So.2d 1276, 1280. Further, a trial court's award of lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. Boudreaux v. State, Dept. of Transp. and Development, 04-0985, p. 13 (La.App. 1 Cir. 6/10/05), 906 So.2d 695, 705, writs denied, 05-2164 (La. 2/10/06), 924 So.2d 174, and 05-2242 (La. 2/17/06), 924 So.2d 1018.
In this matter, Dr. Rand M. Voorhies, Mr. Guidry's treating neurosurgeon, testified by deposition. He stated that he first saw Mr. Guidry in July of 2001, at which time Mr. Guidry complained of severe intermittent low back pain radiating down his leg for the past five years. A CT scan revealed a disc herniation at the L5-S1 level and mild annular disc bulging at the L3-4 and L4-5 levels. Additionally, Mr. Guidry had undergone a disc excision at the L4-5 level in 1989.[6] Therefore, on August 7, 2001, Dr. Voorhies placed Mr. Guidry on work restrictions of no lifting more than 40 pounds, no frequent lifting of more than 20 pounds, and no prolonged bending, stooping, or squatting.[7] Dr. Voorhies also advised Mr. Guidry to quit smoking and lose 100 pounds.
Dr. Voorhies did not see Mr. Guidry again until November 2003, at which time Mr. Guidry complained of worsening left sciatica. Dr. Voorhies noted that Mr. Guidry had lost fifty-five pounds since his last visit. Upon examination, Dr. Voorhies reported that a small but critically placed left-sided herniation at L5-S1 appeared to be distorting the left SI nerve root, causing Mr. Guidry's sciatica. Dr. Voorhies advised Mr. Guidry that he did not think that after a microdiscectomy Mr. Guidry would be disabled, although Mr. Guidry clearly had ongoing axial joint pain. Dr. Voorhies discussed with Mr. Guidry that he had three degenerated discs in his low back and that it was likely that his chronic axial joint pain was emanating from one or more of those structures. Dr. Voorhies further discussed with Mr. Guidry the possibility of a three-level disc fusion in the future to treat the ongoing axial joint pain. Mr. Guidry did not want a fusion because it would most likely prevent him from returning to work as a heavy equipment operator. Therefore, Dr. Voorhies recommended the microdiscectomy at the L5-S1 level to treat Mr. Guidry's sciatica and prevent the disability.
The microdiscectomy at L5-S1 was performed by Dr. Voorhies on December 31, 2003. Dr. Voorhies testified that this type of surgery could take two to six weeks before a patient's release to an office type of job or up to twelve weeks for a work release to a strenuous type of job. Either way, Dr. Voorhies testified, Mr. Guidry would still have the same work restrictions as placed on him in August 2001. Dr. Voorhies answered affirmatively that the surgery was successful and he was prepared to let Mr. Guidry go back to work as a heavy equipment operator.
Mr. Guidry was next seen in Dr. Voorhies' office on February 25, 2004, by a nurse practitioner. The nurse practitioner's notes indicated that Mr. Guidry stated that he was doing well post-surgery until he was in the hospital with bronchitis and also lifted too many grocery bags. On that date, Mr. Guidry complained of pain radiating into his left buttock. Dr. Voorhies stated that might mean that Mr. Guidry herniated or reherniated a disc. Mr. Guidry had no complaints of neck pain at that time. On April 22, 2004, Mr. Guidry was again seen by the nurse practitioner, who indicated that Mr. Guidry had no pain radiating into his left leg, and was ready to return to work. Mr. Guidry was cleared for work with the same restrictions given to him in 2001. There were no complaints of neck pain. On June 8, 2004, Mr. Guidry was again seen by Dr. Voorhies, this time complaining of axial neck pain. Mr. Guidry told Dr. Voorhies that he had gone to a chiropractor and the pain "got worse."
In reviewing MRIs of the lumbar spine, dated October 17, 2003 and October 4, 2004,[8] Dr. Voorhies testified that the 2003 MRI showed a mild bulge at the L3-4 level, mild scar tissue and post-operative changes at the L4-5 level, and a left-sided small disc herniation displacing the SI nerve root at L5-S1. However, Dr. Voorhies had repaired the L5-S1 level on December 31, 2003. Dr. Voorhies further testified that there was a significant change between the 2003 and 2004 MRIs. Although the L4-5 level appeared the same, the 2004 MRI showed a left-sided disc herniation at L3-4, and at L5-S1, "there was a new large recurrent disk herniation on the left." Although Dr. Voorhies had not seen Mr. Guidry since July of 2004, he stated that if the MRI of October 2004 was an accurate rendition of his lower back, it was his opinion that Mr. Guidry should not go back to work. Dr. Voorhies could not say that more probably than not that the herniations now present at L3-4 and L5-S1 are related to the automobile accident in December 2003. However, Dr. Voorhies agreed that a disc herniation at another level could logically cause stress and strain and over time lead to the failure of the disc at the S1-L5 level, although he could point to no studies that would either support or refute that.
Dr. Jorge Isaza, an orthopedic surgeon with a specialty in spine surgery, testified by deposition and at trial. Dr. Isaza first saw Mr. Guidry on April 27, 2004. Mr. Guidry was complaining of neck and lower back pain. According to Mr. Guidry's history, he had previous problems with his lower back, including a prior surgery, but he did not have any neck problems until an automobile accident in December of 2003. Mr. Guidry told Dr. Isaza that he did not go to the emergency room after the accident, but starting complaining of neck pain two or three days later. Dr. Isaza ordered a cervical MRI, which showed a disc herniation at C7-T1, as well as a bulging disc at C3-4. Dr. Isaza tried conservative treatment, including physical therapy, muscle relaxants, medications for inflammation, and injections, to try to relieve Mr. Guidry's pain, all of which were unsuccessful. Surgery on Mr. Guidry's neck was not recommended, because of the difficulty of the surgery and the shortness of Mr. Guidry's neck. Dr. Isaza stated surgery in that area would be unpredictable, and at that point, Mr. Guidry had been able to tolerate his symptoms. His neck problems would limit his job as a heavy equipment operator, or as a full-time truck driver, waiter, or busboy.
Because of the history given to him by Mr. Guidry that he never had any problems with his neck, it was Dr. Isaza's opinion that it was more likely than not that the problem at C7-T1 was caused by the accident of December 2003. Mr. Guidry may have had degenerative changes in his neck that were asymptomatic that were made painful and symptomatic with the accident. Although the prognosis for additional surgery in his lower back was not good, if such surgery did work, Mr. Guidry would still have his neck problems.
Dr. Isaza opined that the reherniation at the L5-S1 level was not related to the accident, as it occurred after Dr. Voorhies' surgery at L5-S1. He also testified that the herniation at L5-S1 shown in the October 2004 MRI was larger than it was in October 2003. When asked about L3-4, Dr. Isaza testified that Dr. Voorhies did not explore L3-4 at the time of surgery. He stated, however, that with the history he was given, it was his opinion that it was more likely than not that the L3-4 herniation was related to the automobile accident. It was Dr. Isaza's opinion that Mr. Guidry was unable to return to his employment as a heavy equipment operator because of both his lumbar spine and cervical spine problems. With regard to the lumbar spine, Dr. Isaza testified that he deferred to Dr. Voorhies. On cross-examination, Dr. Isaza acknowledged that Mr. Guidry has multi-level lumbar problems unrelated to the automobile accident at issue herein. Dr. Isaza was also asked the following:
Q: If you assume for a minute you were able to treat the lumbar spine and get that perfectly fine, he'd still be disabled as a result of his cervical spine; right?
A: To perform his activity or heavy machine operator, yes.
Q: Conversely, he's got multi-level problems that we've discussed here obviously in his lumbar spine. In the event you were to actually, successfully treat his cervical spine, he would still be disabled from his occupation as a result of the problems in his lumbar spine; correct?
A: Well, we'd be limiting his standing and sitting.
Mr. Guidry was forty-three years old at the time of the accident. He testified at trial that although he was sore from the accident, he did not realize that he was hurt until about a month later. Mr. Guidry testified that he opted for a discectomy in his lower back rather than a fusion so he could go back to work. He stated that he previously had back surgery in 1989, which was successful. Mr. Guidry wanted to continue working as a heavy equipment operator, and Dr. Voorhies told him that if the surgery was successful, he could return to his employment. Mr. Guidry stated that surgery was postponed for a week because of his bronchitis, but that it was performed on December 31, 2003. After the surgery, Mr. Guidry began walking and after about five or six weeks had gotten up to walking a mile, when he started having back pain and numbness in his legs. He stated that most of his current problems are with his neck and that his back hurts now and then. Mr. Guidry testified that he had not injured his neck before the December 18, 2003 accident. On cross-examination, he did not recall being treated for neck pain in 1991.[9]
With regard to his work history, Mr. Guidry stated that he was not working at the time of the accident because he was waiting for his back surgery. He testified that he was not terminated from his job, but in February of 2003 after working for Nichols Construction for approximately seven years, there was a work force reduction. Mr. Guidry stated he then went to work for another company through the end of August 2003, at which time there was another reduction of work force. He testified that he did not work in September, October, or November of 2003, except for a few days in October. He stated that he was planning on having back surgery and returning to work.
In its oral reasons, the trial court stated:
[T]he plaintiff has multi-level spine problems. The plaintiff's problem as a result from this accident clearly is his neck and cervical spine. He needs mobility in that region to work as a crane operator. That was his main employment all of his adult life. This by itself would disable the plaintiff from that employment. Dr. Isaza testified the L-3, L-4 problem was more probably than not a result of the accident also and that his lower back limits would prevent the plaintiff from working as a crane operator. . . . You take your victim as you find him. All the previous medical[s] show that Mr. Guidry had neck and back problems previously, possibly even chronic, but they didn't totally disable him to the point where he is now. The intervening accident, December 18, 2003 totally disabled this man over time from his normal activities, be it work activities, family activities.
Further, regarding the argument that Mr. Guidry was unemployed at the time of the accident, the trial court stated:
But I am familiar, being from South Louisiana about people working while the job is working and then terminating, if you will, laid off for a month or two, or a week, or six months sometimes and then getting right back on. I don't, that doesn't impress me the fact that Mr. Guidry was voluntarily underemployed or wasn't ever going to go back to work. He was just off at that time and I understand that from the testimony. So I do believe he's entitled to future and past lost wages.
It is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Where a defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La. 1991); Reck v. Stevens, 373 So.2d 498, 502 (La. 1979).
It is undisputed that Mr. Guidry had a long history of lower back problems. A disc excision was performed in 1989 at the L4-5 level. The herniated disc at the L5-S1 level was discovered in 2001, and Mr. Guidry was placed on work restrictions, but he continued to work through August of 2003, at which time he was off work due to a reduction in work force. Thus, despite a past history of back problems, Mr. Guidry's back did not prevent him from working. Mr. Guidry did not decide to have surgery until the end of 2003, which surgery was performed in December of 2003. Mr. Guidry opted for the microdiscectomy rather than the fusion procedure so that he could continue working as a heavy equipment operator. Dr. Voorhies stated that the surgery in December was successful. Although Mr. Guidry again complained of pain radiating into his leg in February of 2004, that pain had resolved by his next visit to Dr. Voorhies' office in April 2004. The evidence also showed that Mr. Guidry had degenerative neck problems, which were asymptomatic until the accident. The April 2004 MRI of the cervical spine revealed a herniated disc at the C7-T1 level and bulging at C3-4. Dr. Isaza also found it likely that the herniation at L3-4 was caused by the accident. Additionally, Dr. Allen S. Joseph, who saw Mr. Guidry for a neurosurgical evaluation on June 20, 2006, opined that Mr. Guidry's neck problems were most likely caused by the accident in question and that it was possible that the herniated disc at L3-L4 was also causally related to the accident at issue herein.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Bonin v. Ferrellgas, Inc., 03-3024, p. 7 (La. 7/2/04), 877 So.2d 89, 95. Upon our thorough review of the record, and while we may have found differently sitting as the trier of fact, we are unable to say that the trial court manifestly erred in concluding that the plaintiffs proved that Mr. Guidry would have been earning wages but for the accident in question. Thus, given all of the medical testimony, as well as Mr. Guidry's work history despite his back problems, we cannot say that the trial court was clearly wrong. Accordingly, the defendants' first assignment of error is without merit.
The defendants also contend that the trial court erred in finding Ms. Horner free from fault. The defendants assert that while Ms. Horner complied with Deputy Sasso's initial signal to proceed into the intersection, Ms. Horner failed to notice and heed Deputy Sasso's subsequent instruction to stop. Therefore, according to the defendants, Ms. Horner violated her duty to comply with all instructions of a police officer, as well as her never-ending duty to keep a sharp lookout.
All motorists have a never-ceasing duty to maintain a sharp lookout and to see that which in the exercise of ordinary care should be seen. Theriot v. Bergeron, 05-1225, p. 6 (La.App. 1 Cir. 6/21/06), 939 So.2d 379, 383. The defendants also rely on LSA-R.S. 32:231A and 32:56A, which provide, as follows:
The driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this Chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this Chapter.
LSA-R.S. 32:231A.
No person shall fail or refuse to comply with any lawful order or direction of any police officer or weights and standards police officer invested by law with authority to direct, control, or regulate traffic.
LSA-R.S. 32:56A.
These statutes impose a duty on a motor vehicle operator to comply with any lawful order or directive of any police officer invested by law with the authority to direct, control, or regulate traffic, irrespective of the instructions or signals of a traffic control device. Theriot, 05-1225 at p. 7, 939 So.2d 383. Under certain circumstances, a motorist will be relieved of liability for causing an accident if he acted in accordance with directions of a traffic control officer. While directions of a traffic officer do not completely relieve a motorist of all obligations, where the testimony shows clearly that the defendant motorist moved forward in compliance with the directions of the traffic officer at a slow speed and in a careful and prudent manner, he cannot be charged with negligence. Theriot, 05-1225 at p. 7, 939 So.2d 383-84.
It is also well settled that the allocation of comparative negligence is a factual matter within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 4 (La.App. 1 Cir. 11/10/94), 647 So.2d 351, 355.
In the case sub judice, Deputy Dicks testified that he walked out into the northbound lanes of Highway 16 to stop traffic, but that there was no traffic at that time to stop. Meanwhile, Deputy Sasso had already stopped traffic in the southbound lanes of Highway 16 and signaled Ms. Horner to proceed through the intersection. When Deputy Dicks saw Ms. Horner being motioned out, he turned and saw a red pickup truck go past him. Deputy Sasso testified that he then yelled and motioned to Ms. Horner to stop, but he thought the sun might have been in her eyes because she kept going, and the accident occurred. Ms. Horner testified that as she approached the intersection, she slowed and stopped. She stated that she was motioned out and she came out. Ms. Horner said she had no visibility problems, and the sun was not blocking her vision. She did not see Deputy Sasso try to stop her, and the first time Ms. Horner saw the truck was when it hit her.
In reaching its finding of no liability on the part of Ms. Horner, the trial court noted that it considered applicable statutes and jurisprudence and stated:
Also, Ms. Horner, reading the cases and hearing the testimony and looking at the reports and the statements at the accident, I don't find she had any liability because she was relying on two gentlemen wearing sheriff's bright green vest[s] with Sheriff on it to [wave] her out. She was relying on these gentlemen officially, in their official capacity to take care with her coming out into a major intersection, Highway 16. So I really don't see her having any liability in that.
Once motioned out by Deputy Sasso, Ms. Horner was proceeding through the intersection at the direction of the officers. Following and relying on the directions of Officer Sasso, Ms. Horner attempted to make a left turn. There is no evidence in the record that Ms. Horner was acting in any way other than in a careful and prudent manner. Upon a thorough review of the record, we cannot say that the trial court was clearly wrong in finding that Ms. Horner was without fault.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellants.
AFFIRMED.
PARRO, J., dissenting in part and concurring in part.
The evidence presented seems to preponderate in favor of a finding that Mr. Guidry was unable to return to work as a heavy equipment operator as result of his lower back problems that were not related to the automobile accident in question. To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question. Boyette v. United Services Auto. Assn., 00-1918 (La. 4/3/01), 783 So.2d 1276, 1279. Believing that the Guidrys failed to prove by a preponderance of the evidence that Mr. Guidry would have been earning wages but for the automobile accident, I would reverse the award of past and future lost wages. For this reason, I respectfully dissent in part. Otherwise, I concur in the opinion of the majority.
NOTES
[1] The LPSO was named the Livingston Parish Sheriff's Department in the plaintiffs' petition.
[2] The Livingston Parish School Board was dismissed with prejudice prior to the trial of this matter.
[3] The plaintiffs originally filed suit against Interstate Insurance Underwriters, Inc., but, by an amending and supplemental petition, substituted Republic for the previously named defendant Interstate Insurance Underwriters, Inc.
[4] Judgment was subsequently signed on November 2, 2007, dismissing these defendants.
[5] At the beginning of trial, the parties stipulated that Deputies Sasso and Dicks were in the course and scope of their employment at the time of the accident and that St. Paul issued a policy of liability insurance to LPSO, which was in full force and effect on the day of the accident.
[6] The surgery at the L4-5 level in 1989 was performed by Dr. Anthony Ioppolo.
[7] Mr. Guidry's testimony established that he continued to work as a heavy equipment operator despite these restrictions.
[8] Dr. Voorhies also reviewed an MRI taken in April 1996, which "showed that [Mr. Guidry] had a prior disk removed from L4-5 with a small amount of scar tissue. At L3-4 at that time, there was a mild bulge in the disk. And at L5-S1 at that time, there was also a mild bulge in the disk with some drying or desiccation of the disk."
[9] The medical evidence indicates that Mr. Guidry complained of some cervical pain in 1991 and 1995.